IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | | |
|---|---|---|
| LORETTA KLINE, individually, and as Personal Representative for the ESTATE OF ROGER LEE LARGENT | * * | |
| Plaintiff | * | |
| v. | * | Case No. 1:20-cv-00722-JKB |
| STATE OF MARYLAND, et al. | * | |
| Defendants | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT**

NOW COMES, Plaintiff Loretta Kline, individually and as Personal Representative of the Estate of Roger Lee Largent, by and through her undersigned counsel, who hereby opposes Defendants Motion to Dismiss Plaintiff's Amended Complaint, or in the alternative Motion for Summary Judgment. Plaintiff Kline fully incorporates her prior Response in "Opposition to Defendants' Motion to Dismiss Plaintiff's Complaint or in the Alternative for Summary Judgment" (ECF 26) as if fully restated herein. Plaintiff states further in support of this opposition:

**A. The 1983 Claim against Warden Graham Should Not be Dismissed**

It is a matter of settled law that the Eighth Amendment requires prison official to "take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970 (1994); *Makdessi v. Fields*, 789 F.3d 126, 132 (4th Cir. 2015). The United States Supreme Court has confirmed that prison officials have a specific "duty… to protect prisoners from violence at the hand of other prisoners." *Farmer*, 511 U.S. at 833. For purposes

1

of considering the issues raised in Defendants' second dispositive motion, "[i]t has long been established that jail officials have a duty to protect inmates from a substantial and known risk of harm, including harm inflicted by other prisoners." *Jackson v. Quinn*, 828 F.3d 227, 239 (4th Cir 2016)(citing *Farmer*, 511 U.S. at 833)).

Two requirements must be satisfied in order for a prison official to be liable for failing to protect a prisoner from inmate violence. *See Farmer*, 511 U.S. at 834. Initially. "a prisoner must allege a serious or significant physical or emotional injury resulting from the challenged conditions." *Brown v. N.C. Dep't of Corr.*, 612 F.3d 720, 723 (4th Cir. 2010)(quoting *Odom v. S.C. Dep't of Corr.*, 349 F.3d 765, 770 (4th Cir. 2003)) Thereafter, a prisoner must demonstrate that the defendant state actor possessed a "sufficiently culpable state of mind" and acted with "'deliberate indifference' to inmate health or safety." *Farmer*, 511 U.S. at 834 (internal citations omitted). Deliberate Indifference requires "'more than mere negligence,' but 'less than acts or omissions [done] for the very purpose of causing harm or with knowledge that harm will result.'" *Makdessi*, 789 F.3d at 133 (quoting *Farmer*, 511 U.S. at 835). Stated another way, deliberate indifference is "somewhere between the poles of negligence at one end and the purpose of knowledge at the other, the Courts of Appeals have routinely equated deliberate indifference to recklessness." *Farmer*, 511 U.S. at 836.

In this case, which concerns the violent and fatal beating of Roger Largent, it is patent that Plaintiff has appropriately alleged a serious and or significant injury. The critical question for purpose of deciding the pending dispositive motion is thus whether Plaintiff's Amended Complaint includes an adequate prima facie showing that Warden Graham actions, or inactions, were unreasonable and/or reckless in the context of the circumstances alleged in the Amended Complaint; or alternatively if the motion is considered as a summary judgment motion, whether

there is a dispute of fact concerning the adequacy of Warden Graham's actions in the context of the case.

> Whether a prison official acted with "deliberate indifference" is a question of fact that can be proven through direct or circumstantial evidence. Makdessi, 789 F.3d at 133; Parrish, 372 F.3d at 303. A plaintiff can make a prima facie case of deliberate indifference "by showing 'that a substantial risk of [serious harm] was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it.' " Parrish [ex rel. Lee v. Cleveland, 372 F.3d 294, 303 (4th Cir, 2004)] (alteration in original) (quoting Farmer, 511 U.S. at 842, 114 S.Ct. 1970). And a prison official may not avoid liability simply because he was unaware that the inmate was "especially likely to be assaulted by the specific prisoner who eventually committed the assault." Farmer, 511 U.S. at 843, 114 S.Ct. 1970.
>
> Furthermore, a prison official's response to a known threat to inmate safety must be reasonable…. Prison officials are deliberately indifferent if they are aware that "the plaintiff inmate faces a serious danger to his safety and they could avert the danger easily yet they fail to do so." Brown, 612 F.3d at 723 (quoting Case v. Ahitow, 301 F.3d 605, 607 (7th Cir. 2002)). And "a factfinder may conclude that the official's response to a perceived risk was so patently inadequate as to justify an inference that the official actually recognized that his response to the risk was inappropriate under the circumstances." Parrish, 372 F.3d at 303.

*Cox v. Quinn*, 828 F.3d 227, 236 (4th Cir. 2016)

By way of the Motion to Dismiss Plaintiff's Amended Complaint, Defendants once again argue that Plaintiff's Section 1983 "claims against Warden Graham should be dismissed because he was not personally involved in the alleged constitutional violations [and therefore] he was not deliberately indifferent to Mr. Largent's health and safety." (Motion to Dismiss Amended Complaint, p. 2) The facts as plead in the Complaint and later amplified in the Amended

Complaint, as well as the various record materials attached to Defendants' dispositive motions, however, demonstrate that Graham had been adequately "exposed to information" concerning Decedent Largent's plight such that liability may attach in this case.

Plaintiff's Amended Complaint includes averments that Decedent Largent repeatedly attempted to notify WCI staff about perceived threats of violence at the facility before the time of the fatal beating. (Compl. ¶ 11-16; Amended Compl. ¶ 19-29) This has not been controverted. Moreover, Defendant Graham has not controverted Plaintiff's assertions that (1) Decedent Largent directly "contacted the Maryland Department of Public Safety and Correctional Services [DPSCS] and reported that his safety was in jeopardy at WCI…" (Amended Compl. ¶ 25), and (2) that the DPSCS subsequently "directed Warden Graham… to undertake a review of Decedent Largent's classification and housing situation." (Amended Compl. ¶ 25) Defendant Graham maintains that while he may have been aware of Largent's reports, he is shielded from liability in this case because he delegated the investigation of the matter to his subordinates. This position is not consistent with the facts in this case or the controlling law cited herein.

As Defendant Graham has candidly admitted, "[Decedent Largent] specifically sought [his] help getting him placed on Administrative Segregation/Protective Custody or to be transferred to another institution" before the time of the underlying homicide. (Defendant's Motion to Dismiss Plaintiff's Complaint (ECF 11-1), Attached Exhibit No. 6 "Declaration of Richard J. Graham, Jr. ¶ 7) Defendant Graham has also acknowledged receipt of a "true and accurate copy of a letter received from inmate Largent on November 7, 2016), which read in pertinent part:

> Hello. My name is Roger Largent DOC number 447-475 and
> I'm currently housed in cell number 4-A-12A.
> I arrived here at WCI from JCI on June 30, 2016 and was

> placed in housing unit number 5-A-23B.
>
> This same day June 30th 2016 upon returning to the tier from the dinner meal 5-inmates approached me on the tier in a violent manner, one of the inmates had a knife then one of the inmates said we know who you are, you're the guy who just got here from JCI who raped that girl in Hagerstown, she is my homeboy's sister, we are gonna kill you.
>
> Later the same evening, … [I] approached Officer J. Wakefield and informed him that my life is in grave danger and that I need to be placed on protective custody. Officer J. Wakefield informed me that he was not going to place me on protective custody that "if" my life was in danger the best he could do is write me a ticket for refusing housing and have be placed on disciplinary segregation and housing unit # 4.
>
> Since that day June 30, 2016 I have refused housing three times and I'm still in housing unit number 4 for refusing housing. Because I know that my life is in grave danger in the general population….
>
> I am sending you this letter in hopes of you being able to assist me in dealing with my situation… and being able to help me in being placed on ADMIN Seg/Protective Custody or be transferred to another institution where hopefully I can live my life in a safe environment where my life, safety, and well being is not in constant danger.

(*Id.*, Attachment A; Amended Compl. ¶ 30) According to Defendant Graham, he "forwarded [Decedent Largent's] letter to subordinate staff to look into and report back by November 22, 2016." (Defendant's Motion to Dismiss Plaintiff's Complaint (ECF 11-1), Attached Exhibit No. 6 "Declaration of Richard J. Graham, Jr. ¶ 8) Defendant Graham further maintains that the matter was investigated by Case Management Specialist II Shawn Gainer who interviewed Largent and

then "routed his response [to Defendant Graham] through the Unit Manager and Chef of Security." (Id.) At that point, Defendant Graham "took no further action." (Id.)

By his own admission, Defendant Graham likewise did nothing to address Decedent Largent's ongoing confinement in Administrative Segregation which had spanned approximately six months (since June of the same year) at the time of the correspondence. Defendant Graham was aware that Decedent Largent was utilizing this self-imposed segregation as refuge from other inmates within the facility. Defendant Graham further understood thar Decedent Largent had been subjecting himself to confinement that spanned 23 hours of every day because he was afraid to return to the General Population. Defendant Graham had a ready and easy ability to fashion a resolution to the ongoing situation. Yet he did nothing about it.

The risk to Decedent Largent by his continued detention in Administrative Segregation was unreasonably compounded when inmate Frye was moved into his cell. As plead within the Amended Complaint:

> 34. In the interim, on December 8, 2016, Donte Antonio Frye was transferred to from the Eastern Correctional Institution. Frye was a known violent offender who had been convicted of, among other things, Attempted Second Degree Murder in 1993, Attempted Second Degree Murder in 2004, and First-Degree Assault in 2014. Frye, who was serving a 25-year sentence at the time of the subject occurrence, **had a history of assaulting cellmates and also had self-reported a history of blackouts and hearing voices "telling him to kill."** He was designated for "maximum security" confinement.
>
> 35. At the time of his transfer to WCI, Donte Frye was serving a sanction of disciplinary segregation in connection with a violent assault on another inmate. He was continued on disciplinary segregation at WCI.
>
> 36. Frye had a documented history of assaultive conduct during the course of his incarceration beginning on April 11, 2013. Among other instances of misconduct, he had attempted to assault correctional officers on January 22, 2015; had violently assaulted a

cell mate on November 20, 2015; and had violently assaulted another inmate on October 21, 2016.

37. Moreover, Frye was known to have consistently engaged in regular assaultive behavior during a prior incarceration that spanned 2000 to 2011. Frye had been formally disciplined on 11 different occasions for assaultive conduct. He was accordingly documented to have assaulted another inmate on May 18, 2011; to have assaulted another inmate on June 21, 2008; to have assaulted another inmate on December 19, 2007; to have assaulted correctional staff on February 22, 2006; to have assaulted an inmate on October 18, 2005; to have assaulted an inmate on July 30, 2003; to have assaulted an inmate on March 24, 2003; to have assaulted correctional officers and an inmate on November 8, 2002; to have assaulted an inmate on July 3, 2000; and to have assaulted in inmate on February 15, 2000. This consistent pattern of assaultive behavior was known, actually and/or constructively, to WCI staff and Defendant Warden Graham.

38. Notwithstanding his known violent propensities, documented history of assault on inmates and correctional officers, and continuing segregation in connection with a violent attack on another inmate immediately before his arrival at WCI, Frye was placed in cell A12 with Decedent Largent.

(Plaintiff's Amended Complaint ¶¶ 34-38(emphasis supplied)) Plaintiff maintains that defendant Graham exhibited deliberate indifference to Decedent Largent's health and safety by allowing him to be confined in a cell with inmate Frye notwithstanding the latter's known violent propensities and psychiatric issues.

Defendant Graham acknowledges that, as the Warden of WCI, he would have had some involvement with "reviewing single-cell housing pursuant to WCI 230.0004.1.02(6)(b)(iii)…." (Motion to Dismiss Amended Complaint, p. 4) He claims that he had no cause to personally review Decedent Largent or inmate Frye's placement, because neither had been referred for single-cell housing. (Id.) According to Defendant Graham:

> With regard to inmate Frye, although he might have had several instances of fighting with or assaulting other inmates, that fact

7

> alone was not enough to merit housing him alone. Very few
> inmates merit single cells and even then, it is only for as short a
> period as possible…. Moreover, it is reserved for inmates who
> absolutely cannot function with other inmates, to include those
> who have killed other inmates or seriously injured staff.

(Defendant's Motion to Dismiss Plaintiff's Complaint (ECF 11-1), Attached Exhibit No. 6 "Declaration of Richard J. Graham, Jr. ¶ 13) However, Defendant Graham's assertion is inconsistent with his own documentary exhibits attached to Defendants' first Motion to Dismiss, or in the alternative, Motion for Summary Judgment which show that inmate Frye had been designate for single cell confinement before he arrived at WCI.

Among the materials appended to the dispositive motion was Inmate Frye's Traffic Sheet reflecting the manner in which he was confined prior to the time of the subject homicide. (Defendant's Motion to Dismiss Plaintiff's Complaint (ECF 11-1), Attached Exhibit No. 5, Part B "Frye Traffic Sheet") This document shows that inmate Frye had been held in Administrative Segregation that began at Roxbury Correctional Institution on or about July 4, 2016; that he was continued on Administrative Segregation when he was later transferred to Eastern Correction Institution on July 11, 2016 and also placed on an addition 120 days of Administrative Segregation beginning on July 21, 2016; and that when he was subsequently transferred to WCI, on December 8, 2016, he was again continued on Administrative Segregation. (Id.) The same document shows that the Inmate Frye had been removed from Double Bed administrative Segregation and placed in a Single Bed segregation cell on October 22, 2016, before the time of his transfer to WCI. (Id.)

Defendant Graham's appended documentary evidence further supports an inference that something occurred while inmate Frye was being detained in Administrative Segregation at ECI which caused him to be reclassified for Single Bed placement. The "Offender Case Management

System" information sheet for Donte Frye shows that the was convicted of an infraction that resulted in 180 days of additional segregation on or about November 7, 2016. (Defendant's Motion to Dismiss Plaintiff's Complaint (ECF 11-1), Attached Exhibit No. 9, Part B "Frye Adjustment History") By way of this infraction, which would have occurred while inmate Frye was already held on Administrative Segregation, Frye was required to continue in Administrative Segregation through April 18, 2017. (Id.) This classification followed him to WCI where he was immediately placed in Administrative Segregation.

Defendant Graham offers no explanation as to why Inmate Frye's Single Bed classification was discontinued when he was transferred to the WCI on December 8, 2016. He also does not offer any explanation as to why his acknowledged obligation to review a Single Bed classification/assignment would not have been triggered when Frye was transferred into the facility, with a designation for and placement in Single Bed Administrative Segregation. Given these circumstances, and for purposes of the instant motion, this Honorable Court should draw reasonable conclusions that Defendant Graham was obligated to review inmate Frye's classification and know of it upon his arrival. Any such review would have resulted in an inevitable conclusion that inmate Frye posed a serious danger to Decedent Largent's safety. Decedent Graham would simultaneously have understood that he could abate the danger flowing to Decedent Largent by continuing inmate Frye in the Single Administrative housing initiated at ECI and/or not placing him in segregation with a vulnerable and substantially smaller inmate.

Moreover, because Defendant Graham was actively engaged in reviewing Decedent Largent's perceived need for protection at WCI, before the time of inmate Frye's arrival at the facility, he reasonably should have appreciated the risk of continuing hm in Administrative

9

Segregation and placing a known violent and psychologically disturbed inmate in segregation with him.

By allowing the circumstance that ultimately resulted in the violent homicide at issue in the case, Defendant Graham violated Decedent Largent's constitutional rights. *See Farmer*, 511 U.S. at 836 ("It is, indeed, fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk."); *See also Thompson v. Commonwealth of Va*, 878 F.3d 89, 105-06 (4th Cir 2017)(The Eighth Amendment protects prisoners from "unnecessary and wanton infliction of pain." That protection imposes on prison officials an affirmative "obligation to take reasonable measures to guarantee the safety… of inmates."); *L.W. v. Grubbs*, 92 F.3d 894, 900 (9th Cir. 1996) ("Deliberate indifference to a known, <u>or so obvious as to imply knowledge of</u>, danger, by a supervisor who participated in creating the danger, is enough."(emphasis supplied)); *Hernandez ex rel. Hernandez v. Texas Dep't or Protective & Regulatory Servs.*, 380 F.3d 872, 880-881 (5th Cir. 2004) (holding that although deliberate indifference standard requires that officials consciously disregard a known excessive risk to a victim's health and safety, officials need not be warned of a specific danger provided they know of facts from which an inference can be drawn that a substantial risk of harm exists); *Harris v. Maynard*, 843 F.2d 414, 416 (10th Cir. 1988) (wanton or obdurate disregard of, or deliberate indifference to, prisoner's right to life as a condition of confinement is substantive deprivation).

### B. Defendant Graham is Not Entitled to Qualified Immunity

Qualified immunity analysis involves two inquiries "(1) whether the plaintiff has established the violation of a constitutional right, and (2) whether that right was clearly established at the time of the alleged violation." *Raub v. Cambell*, 785 F.3d 876, 881 (4th Cir.

10

2015). The evaluation requires this Honorable Court to focus not on "whether the right allegedly violated was established as a broad general proposition but whether it would be clear to a reasonable official that his conduct was unlawful in the situation he confronted." *Raub*, 785 F.3d at 881 (internal quotations omitted). For constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal quotations omitted).

In the instant case, Defendant Graham was fully apprised of his obligation to protect Decedent Largent from violence at the hands of other inmates prior to the time of the underlying homicide. The issue sufficiently litigated such that Defendant Graham also would have understood his constitutional obligation to protect Decedent Graham from inmate Frye and/or not place Decedent Graham in segregated confinement where he might be easily murdered by inmate Frye.

The Supreme Court had previously stated and reaffirmed that "qualified immunity is lost when plaintiff's point either to 'cases of controlling authority in their jurisdiction at the time of the incident' or to ' a consensus of cases of persuasive authority.'" *Booker v. S.C Dep't of Corr.*, 855 F.3d 533, 539 (4th Cir. 2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731 (2011)). "[I]n evaluating whether a right is clearly established in a given circuit, the Supreme Court has looked to precedent from other circuits." *Booker*, 855 F.3d at 539. *See also Pearson v. Callahan*, 555 U.S. 223, 244 (2009) (considering decisions from "three Federal Courts of Appeals" and noting officers "ere entitled to rely on these cases, even though their own Federal Circuit had not yet ruled on" constitutional issue).

In this case, "*Farmer* applies with 'obvious clarity': the case clearly establishes that the Eighth Amendment protects prisoners from violence perpetrated by other inmates." *Strickland v.*

*Halsey*, 638 Fed.Apx. 179, 189 (2015) *See Price v. Sasser*, 65 F.3d 342, 346 (4th Cir.1995) (stating that "the law governing failure to protect [inmates] ... was unclear in some important respects" prior to *Farmer*). Since the decision was reached in 1994 it has been understood that "prison officials have a duty…to protect prisoners from violence at the hands of other prisoners…Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." *Farmer*, 511 U.S. at 833 (internal citations and quotations omitted).

The Fourth Circuit had likewise established that "the Eight Amendment requires prison officials to 'take reasonable measures to guarantee the safety of the inmates'" and thus "they have a specific "duty … to protect prisoners from violence ta the hands of other prisoners.'" *Jackson*, 828 F.3d 227, 235 (quoting *Farmer*, 511 U.S. at 832-33) "Other circuits similarly agree that *Farmer*, and similar cases, clearly established that the Eighth Amendment is violated when an inmate commits violence against another inmate." *Strickland*, 638 Fed.Apx. at 189; *See, e.g., Cantu v. Jones*, 293 F.3d 839, 845 (5th Cir.2002) ("[T]he constitutional right of offenders to be protected from harm was clearly established at the time of the attack."); *Bistrian v. Levi*, 696 F.3d 352, 367 (3d Cir.2012) (inmate "had a clearly established constitutional right to have prison officials protect him from inmate violence."); *Curry v. Crist*, 226 F.3d 974, 977 (8th Cir.2000) ("Prison inmates have a clearly established Eighth Amendment right to be protected from violence by other inmates.").

Various circuits have more specifically held that the Eight Amendment is violated when violence is perpetrated by cellmates with known violent propensities. *See e.g. Bowen v. Warden Baldwin State Prison*, 826 F.3d 1312 (11th Cir. 2016) (appeals court reversed decision granting qualified immunity to deputy warden and a corrections officer who knew that a cellmate was a

convicted murderer, had been designated as a Level III, and had previously been transferred to the lock-down segregation unit for after assaulting his former cellmate); *Zanes v. Rhodes*, 64 F.3d 285 (7th Cir. 1995) (pro se complaint stated a claim where plaintiff alleged she was placed in a cell with a dangerous mentally ill inmate); *Young v. Selk*, 508 F.3d 868 (8th Cir. 2007) (Prison officials were not entitled to qualified immunity when they were aware of a substantial risk of serious harm to the plaintiff prisoner from his roommate and did not reasonably respond to the risk); *Flint ex rel. Flint v. Kentucky Dept. of Corr.*, 270 F.3d 340 (6th Cir. 2001) (Correctional officials and employees who allegedly had knowledge of prisoners' death threats against inmate subsequently murdered at his prison printshop workplace yet took no protective actions were not entitled to qualified immunity from liability.); and *Nelson v. Overberg*, 999 F.2d 162 (6th Cir. 1993) (Prison official, who took no action to further investigate after prisoner wrote him two letters mentioning threats to him and "enemies" among the other inmates, was not entitled to qualified immunity from suit by inmate, who was later attacked by two prisoners.).

In *Bowen* the Eleventh Circuit Court of Appeals addressed a circumstance that are substantially similar to the facts alleged in the instant case. The appellate court explained its consideration of the following facts in disallowing qualified immunity:

> Setting aside any conclusory legal allegations, the second amended complaint alleges that these two defendants knew: (1) that Merkerson had been convicted of murder; (2) that Merkerson was a severe paranoid schizophrenic who suffered from auditory hallucinations and violent delusions involving his cellmates…(5)…Merkerson had been transferred…for assaulting his previous cellmate;…(8) that Merkerson was significantly larger than Mr. Bowen; and (9) that the cell that the two inmates shared was small…

*Bowen*, 826 F.3d at 1321. In the instant case, Donte Frye was known to Defendants State of Maryland and Graham as a violent offender with a history of violent and aggressive behavior and

13

attacks on correctional officers and inmates alike. (Amended Compl. ¶ 34-37) Further, Defendant Graham knew Donte Frye was serving a sanction of disciplinary segregation, with Single Bed classification, upon his transfer to WCI. (Amended Compl. ¶ 35) Defendant Graham further understood that "Frye, who was 6'2" tall and weighed 270 pounds, had a ready and obvious ability to physically overwhelm then 69-year-old Decedent Largent, who was 5'11" tall and weighed only 160 pounds." (Amended Compl. ¶ 39). It was reasonably foreseeable and should have been anticipated by Defendant Graham that, upon being placed in a cell with no other human interaction for 23 hours per day, Frye would eventually violently attack Decedent Largent. The analysis employed by the *Bowen* Court stands to negate qualified immunity in the instant case.

Though not exactly the same factually, the above cited case decided in advance or the subject homicide were sufficiently similar to place the Defendants on notice of the Eight Amendment violation in this case. In *Hope v. Pelzer*, 536 U.S. 730 (2002), the Supreme Court explained:

> Our opinion in [*U.S. v. Lanier*, 520 U.S. 259 (1997).] thus makes clear that officials can still be on notice that their conduct violates established law even in novel factual circumstances. Indeed, in *Lanier,* we expressly rejected a requirement that previous cases be "fundamentally similar." Although earlier cases involving "fundamentally similar" facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding. The same is true of cases with "materially similar" facts.

*Hope*, 536 U.S. at 742.

Defendant's reliance on *Pyrtle v. Hayes*, 2012 WL 6547497. *7 (M.D.N.C. Dec. 14, 2012) is misplaced. In *Pyrtle*, the court determined that the facts in the light most favorable to the Plaintiff did not support an inference that prison officials knew that Hayes committed an

assault prior to the assault on Plaintiff. *Pyrtle*, 2012 WL 6547497 *7. Defendant Warden Graham was not merely aware of Frye's generally problematic nature, rather Defendant Warden Graham knew specifically that Frye had committed several assaults against other inmates and that an assault had precipitated his transfer to WCI. (Amended Compl. ¶ 35) The substantial risk of harm posed by Donte Frye is obvious based on Donte Frye's criminal and assaultive history as alleged in Plaintiff's First Amended Complaint.

As discussed *supra*, Plaintiff's allegations contained in the First Amended Complaint state a claim of violation of clearly established law. Therefore, dismissal before the commencement of discovery on the basis of qualified immunity is inappropriate.

**C. Defendant State of Maryland has failed to offer any basis to support its request that Plaintiff's state law claims be dismissed.**

In *Lamb v. Hopkins*, 303 Md. 236 (1985), the Court of Appeals "expressly adopt[ed] § 319 [of the RESTATEMENT (SECOND) OF TORTS] as the law of this State governing the duty of those in charge of persons having dangerous propensities." *Lamb*, 303 Md. at 245. In *Rodriguez v. State*, 218 Md. App. 573 (2014), the Maryland Court of Special Appeals addressed the special relationship that imposes a duty upon correctional officers to protect persons in their custody from harm and explained:

> Similarly, the special relationship that imposes a duty upon correctional officers to protect persons in their custody from harm is recognized in § 320 of the Restatement (Second) of Torts, which states:
>
>> One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal power of self-protection or to subject him to association with persons likely to harm him, is

15

> under a duty to exercise reasonable care so to
> control the conduct of third persons as to prevent
> them from intentionally harming the other or so
> conducting themselves as to create an unreasonable
> risk of harm to him, if the actor
>
>> (a) knows or has reason to know that he has the
>> ability to control the conduct of the third
>> persons, and
>>
>> (b) knows or should know of the necessity and
>> opportunity for exercising such control.
>
> Comment c to § 320 indicates that the duty is applicable when a **jailer has custody of a prisoner who is unable to protect himself from "notoriously dangerous" persons, "as where a prisoner is put in a cell with a man of known violent temper."**

*Rodriguez v. State*, 218 Md. App. at 627-28 (emphasis added).

This stated duty of reasonable care is applicable in the instant case. Defendant State of Maryland makes no argument that Plaintiff's Wrongful Death and Survival action were inadequately plead. Defendant State of Maryland has also failed to illuminate any undisputed facts that might allow for the imposition of summary judgment in this case. For these reasons, Plaintiff respectfully requests that the request for a dispositive ruling on her the state law claims included within the Amended Complaint be denied.

I. **Conclusion**

WHEREFORE, Plaintiff Loretta Kline, individually and as Personal Representative for the Estate of Roger Lee Largent, respectfully requests that this Honorable Court deny Defendant Richard J. Graham, Jr. and State of Maryland's Motion to Dismiss the Amended Complaint, or in the alternative, Motion for Summary Judgment, and grant such further and additional relief as it deems to be necessary and appropriate.

Respectfully Submitted,

IAMELE & IAMELE, LLP

_____/s/_____
Anton L. Iamele
Client Protection Fund #: 9812160049
201 North Charles Street, Suite 400
Baltimore, MD 21201
Telephone: 410-779-6160
Facsimile: 410-779-6161
aiamele@iamelelaw.com
*Counsel for Lorretta Kline and the*
*Estate of Roger Lee Largent*

## **HEARING REQUEST**

Plaintiff request that a hearing be held concerning Defendant's Motion to Dismiss or in the Alternative Motion for Summary Judgment and the instant Opposition to the same.

_____/s/_____
Anton L. Iamele

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY, that on this **29th** day of **September, 2020**, a copy of the foregoing was transmitted by way of this Court's electronic filing system, to the following:

Michael O. Doyle, Esquire
Matthew M. Mellady, Esquire
Office of the Attorney General
Department of Public Safety
and Correctional Services
300 East Joppa Road, Suite 1000
Towson, MD 21286

_____/s/_____
Anton L. Iamele