IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **LORRETTA KLINE,** | * | |
| Plaintiff, | * | |
| v. | * | |
| | | **CIVIL NO. JKB-20-0722** |
| **STATE OF MARYLAND,** *et al.*, | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM

This case arises out of the murder of Roger Largent while he was an inmate at the Western Correctional Institution ("WCI"). Plaintiff Loretta Kline, Largent's daughter and personal representative, sued (1) the State of Maryland, Maryland Department of Public Safety and Correctional Services and (2) former Warden Richard J. Graham, Jr. in the Circuit Court for Allegany County, Maryland, alleging violations of 42 U.S.C. § 1983 and Maryland law. Defendants removed the case to this Court and moved to dismiss.

Now pending before the Court are Defendants' First Motion to Dismiss (ECF No. 11) and Second Motion to Dismiss (ECF No. 29). The First Motion has been rendered moot by the filing of Plaintiff's Amended Complaint, and the Second Motion is fully briefed. No hearing is required. *See* Local Rule 105.6 (D. Md. 2018). For the reasons set forth below, the Court will grant Defendants' Second Motion to Dismiss (ECF No. 29) in part. Plaintiff's § 1983 claim will be dismissed, and the case will be remanded to the Circuit Court for Allegany County, Maryland.

## I.     *Background*[1]

Roger Largent died on February 11, 2017 at the age of sixty-nine. (Am. Compl. ¶ 2, ECF No. 25.) Plaintiff Lorretta Kline is Largent's daughter and personal representative. (*Id.* ¶¶ 2–3.) She is a resident of the State of Maryland. (*Id.*) Defendant "the Department of Public Safety and Correctional Services" ("DPSCS") "is an executive department of the Maryland State Government, which was and is responsible for operating the Western Correctional Institute." (*Id.* ¶ 4.) Defendant Richard Graham was the Warden of WCI at the time of the events at issue. (*Id.* ¶ 5.)

Largent was convicted of raping his developmentally disabled adult stepdaughter and sentenced to an eighteen-year term of imprisonment on May 16, 2016. (*Id.* ¶ 9.) *See also Largent v. State*, No. 587, Sept. Term 2016, 2017 WL 605028 (Md. Ct. Spec. App. 2017) (describing facts of the case).[2] He was subsequently remanded to the custody of DPSCS and classified for Medium Security Confinement. (Am. Compl. ¶¶ 11–12.) On or about June 30, 2016, Largent was transferred to WCI. (*Id.* ¶ 20.) According to the Amended Complaint, on the day he arrived at WCI, Largent "was approached by a number of inmates, one of whom was brandishing a makeshift knife." (*Id.* ¶ 21.) Per-Largent, one of these inmates told Largent: "we know who you are, you're the guy who just got here from JCI who raped that girl in Hagerstown, she is my homeboy's sister, we are gonna kill you." (*Id.* ¶ 30.)

Largent reported the incident to a correctional officer, stated that he would not return to his cell in the general population because he did not feel safe, and asked to be placed in protective custody. (*Id.* ¶ 21.) Instead of moving Largent to protective custody, the officer cited him for an

---

[1] The facts in this section are taken from the Amended Complaint and construed in the light most favorable to Plaintiff. *See Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997).

[2] *See Witthohn v. Fed. Ins. Co.*, 164 F. App'x 395, 397 (4th Cir. 2006) (explaining that a district court may take judicial notice of official public documents such as state court filings).

infraction and placed him in administrative segregation. (*Id.* ¶¶ 21–22.) Largent pled guilty to the infraction and was placed in disciplinary segregation for forty-five days. (*Id.*) At the end of that forty-five-day term, Largent again refused to return to the general population and was sentenced to another forty-five days of disciplinary segregation. (*Id.* ¶¶ 23–24.) While in segregation, Largent was separated from the general population and confined for twenty-three hours per day. (*Id.* ¶ 40.) As a result, Largent actually had less interaction with other inmates than he would have had in protective custody, where inmates have "equal Institutional privileges and programs as the General Population[.]" (WCI Directive No. 230.0004.1, at Appx. 2 § VI.B, Yates Decl. Attachment B, ECF No. 13-2).[3]

Largent subsequently reported to DPSCS "that his safety was in jeopardy at WCI due to continuing inmate threats," and "DPSCS, in turn, directed Warden Graham and WCI staff to undertake a review of Decedent Largent's classification and housing situation." (Am. Compl. ¶ 25.) WCI officials interviewed Largent, and Largent again reported the alleged threat but was unable to provide information identifying any of the inmates who had menaced him. (*Id.*) Given his inability to provide identifying information, the WCI officials declined to place Largent in protective custody. (*Id.*) Graham's subordinate Acting Warden Weber approved this determination, and Largent was instructed to return to the general population. (*Id.* ¶ 26.) He again refused and therefore remained in disciplinary segregation. (*Id.* ¶ 27.)

On November 1 and November 2, Largent submitted two Requests for Administrative Remedy, again asking to be moved to protective custody based on the reported threat. (*Id.* ¶¶ 28–

---

[3] Because the Amended Complaint quotes extensively from WCI Directive 230.0004.1 (*see* Am. Compl. ¶¶ 16–17), the Court may take judicial notice of the contents of that directive. *See Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004) (internal quotation marks and citation omitted) ("[W]hen a defendant attaches a document to its motion to dismiss, a court may consider it in determining whether to dismiss the complaint if it was integral to and explicitly relied on in the complaint and if the plaintiffs do not challenge its authenticity.").

3

29.) On November 7, Largent wrote Graham a letter requesting that he intervene. (*Id.* ¶ 30.) Graham responded by directing his subordinates to conduct an additional investigation. (*Id.* ¶ 31.) Because Largent remained unable to provide information regarding the identities of any of the individuals who allegedly threatened him, the WCI investigators again decided not to refer Largent for protective custody. (*Id.*) Denied placement in protective custody, Largent continued to refuse to rejoin the general population and therefore remained in segregation for the term of his incarceration. (*Id.* ¶¶ 32–33.)

On December 8, 2016, Donte Frye was transferred to WCI, and he was subsequently assigned to be Largent's cellmate. (Am. Compl. ¶¶ 34–39.) Frye was both much younger and much larger than Largent; at 6'2 and 270 pounds, Frye stood three inches taller and weighed over 100 pounds more than his sixty-nine-year-old cellmate. (*Id.*) Frye also had a history of attacking his cellmates and other inmates. (*Id.*) During a prior incarceration from 2000–2011, Frye had "been formally disciplined on 11 different occasions for assaultive conduct." (*Id.* ¶ 37.) Following release, Frye committed assault and was reincarcerated. (*Id.* ¶¶ 34–36.) He had then attempted to assault a corrections officer in January 2015, assaulted a cellmate in November 2015, and assaulted another inmate in October 2016. (*Id.* ¶ 36.) When he was moved to WCI, Frye was designated for maximum security confinement and was serving a period of disciplinary segregation. (*Id.* ¶¶ 34–35.) Yet despite the mismatch in their security designations, ages, physical characteristics, and personal histories, WCI officials decided to designate Frye as Largent's cellmate.

Plaintiff alleges that the two men did not get along and that Frye "reported his continuing disagreements with Decedent Largent to WCI personnel." (*Id.* ¶ 42.) Plaintiff does not allege that Largent ever reported concerns regarding Frye or that either inmate filed formal complaints regarding the other. Nor does Plaintiff allege that Largent contacted Graham following Frye's

4

designation as his cellmate. Nevertheless, Plaintiff asserts that Graham "knew or reasonably should have known" Frye presented a danger to Largent. (*Id.* ¶¶ 43, 54, 79.)

On February 11, 2017, Frye "stated that he intended to kill Decedent Largent" during a haircut, per the report of one inmate. (Am. Compl. ¶ 44.) That evening, Frye beat Largent to death. (*Id.* ¶¶ 44–49.) Four days later, Largent's conviction was vacated and his case was remanded for a new trial. (*Id.* ¶ 51.) *See also Largent v. State*, 2017 WL 605028 (finding that the trial court had improperly allowed a nurse to offer unqualified expert testimony regarding whether Largent's stepdaughter's lack of injuries indicated that she had consented). Per the Amended Complaint, Largent's stepdaughter "later recanted her testimony." (Am. Compl. ¶ 51.)

On February 7, 2020, Kline filed suit against Defendants in the Circuit Court for Allegany County, Maryland. (*See* Compl., ECF No. 2.) Kline brought a survival action negligence claim and a wrongful death claim against DPSCS. (*Id.* ¶¶ 38–50.) She also brought a claim against Defendant Graham pursuant to 42 U.S.C. § 1983 for violation of Largent's rights under the Fourth and Fourteenth Amendments to the U.S. Constitution. (*Id.* ¶¶ 51–62.) And she brought a claim for violation of the Maryland Declaration of Rights against both Defendants. (*Id.* ¶¶ 63–67.)

Defendants removed the matter to this Court, invoking the Court's federal question jurisdiction over the § 1983 claim and the Court's supplemental jurisdiction over the other claims. (*See* Not. Removal, ECF No. 1.) Defendants then filed a motion to dismiss or for summary judgment. (First. Mot. Dismiss, ECF No. 11.) Plaintiff opposed the motion (Opp'n to First Mot., ECF No. 26), and filed an Amended Complaint, mooting the motion. Defendants then filed a motion to dismiss the Amended Complaint or for summary judgment (Second Mot. Dismiss, ECF No. 29), and Plaintiff filed a second opposition (Opp'n to Second Mot., ECF No. 32).

## *II.     Legal Standard*

As noted, Defendants style their dispositive motion as a motion to dismiss or for summary judgment. (*See* Second Mot. Dismiss.) Under Rule 12(d) of the Federal Rules of Civil Procedure, a court faced with a motion styled in this manner must decide whether to treat the motion as a motion to dismiss under Rule 12 or a motion for summary judgment under Rule 56. *See Costley v. City of Westminster*, Civ. No. GLR-16-1447, 2017 WL 35437, at *3–4 (D. Md. Jan. 4, 2017), *aff'd sub nom. Costley v. Steiner*, 689 F. App'x 753 (Mem.) (4th Cir. 2017). Pre-discovery summary judgment generally should not be granted where a plaintiff files an affidavit pursuant to Rule 56(d) arguing that specific discovery is necessary for the plaintiff to respond to the defendant's evidence. *See Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 721 F.3d 264, 281 (4th Cir. 2013). Plaintiff has filed such an affidavit, arguing that it would be unfair for the Court to consider the numerous affidavits and exhibits submitted by Defendants without providing Plaintiff the opportunity to depose the affiants and review additional documents. (*See* Iamele Aff., Opp'n to First Mot. Dismiss Ex. 1, ECF No. 26-1.) In light of this affidavit, the Court will analyze Defendants' motion under the Rule 12 standard.

"In considering a motion to dismiss" pursuant to Rule 12(b)(6), the Court must "accept as true all well-pleaded allegations and view the complaint in the light most favorable to the plaintiff." *Venkatraman v. REI Sys., Inc.*, 417 F.3d 418, 420 (4th Cir. 2005). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678. "A pleading that offers 'labels and

6

conclusions' or . . . 'naked assertion[s]' devoid of 'further factual enhancement'" will not suffice. *Id.* (alteration in original) (quoting *Twombly*, 550 U.S. at 555, 557).

### *III. Analysis*

Plaintiff's claim against Graham brought pursuant to 42 U.S.C. § 1983 will be dismissed. Plaintiff has not alleged facts that plausibly could establish the subjective deliberate indifference necessary to prove a constitutional violation on Graham's part. The Court will decline to exercise supplemental jurisdiction over Plaintiff's state law claims and will instead remand the case to the Circuit Court for Allegany County, Maryland for further proceedings.

To state a § 1983 claim, a plaintiff must plausibly allege that a defendant acting under color of state law violated his "rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. A court faced with such a claim is required to make a preliminary determination whether the defendant official is entitled to qualified immunity. This is a two-step inquiry that asks first whether the plaintiff's allegations plausibly establish "that the official's actions violated a constitutional right, and second, whether the right alleged to have been violated was clearly established at the time the violation occurred[.]" *Wilkins v. Upton*, 639 F. App'x 941, 943 (4th Cir. 2016).

Here, Plaintiff claims that while acting under color of state law, Graham violated her father's Fourteenth Amendment rights by allowing Frye to murder him.[4] The Amended Complaint invokes the Eighth Amendment prohibition on the infliction of "cruel and unusual punishments," which has been incorporated against the states through the Fourteenth Amendment's due process clause. *See Timbs v. Indiana*, 139 S. Ct. 682 (2019). The Supreme Court has held that this

---

[4] Though Count III is captioned as a claim for violation of the Fourth and Fourteenth Amendments, the Fourth Amendment is not otherwise referenced in the Amended Complaint (*see* Am. Compl. ¶¶ 74–85), and Plaintiff implicitly concedes Defendants' argument that the relevant Amendments are the Fourteenth and Eighth.

7

prohibition imposes upon correctional officials "a duty to protect prisoners from violence at the hands of other prisoners[.]" *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (internal quotation marks and alterations omitted). However, "not every injury suffered by a prisoner at the hands of another translates into constitutional liability for prison officials responsible for the victim's safety." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015) (internal quotation marks and citation omitted).

To establish that a particular prison official violated his Eighth Amendment rights, a "plaintiff must satisfy a two-part test, consisting of both an objective and a subjective inquiry[.]" *Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016). First, the plaintiff "must establish a serious deprivation of his rights in the form of a serious or significant physical or emotional injury." *Danser v. Stansberry*, 772 F.3d 340, 346 (4th Cir. 2014) (internal quotation marks and citation omitted). Second, the plaintiff must show that the official "had a 'sufficiently culpable state of mind,' which, in this context, consists of 'deliberate indifference to inmate health or safety.'" *Raynor*, 817 F.3d at 127–28 (quoting *Farmer*, 511 U.S. at 834). This is a subjective inquiry, and for direct deliberate indifference to be found, "the prison official [must have] had actual knowledge of an excessive risk to the plaintiff's safety." *Danser*, 772 F.3d at 347. Put differently, "[t]he defendant must 'be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and* he must also draw the inference.'" *Raynor*, 817 F.3d at 128 (emphasis in original) (quoting *Farmer*, 511 U.S. at 837); *see also Wilkins*, 639 F. App'x at 944 (A plaintiff must establish both "actual knowledge" and that "the prison official 'recognized that his actions were insufficient to mitigate the risk of harm to the inmate[.]'") (quoting *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008)). In the absence of direct knowledge of a particular danger, a plaintiff may alternatively establish supervisory deliberate indifference by showing that:

8

> (1) [a] supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a "pervasive and unreasonable risk" of constitutional injury; (2) the supervisor's response to this knowledge was so inadequate as to show "deliberate indifference or tacit authorization" of the offensive practices; and (3) there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered.

*Wilkins*, 639 F. App'x at 945 (quoting *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994)).

There can be no doubt that the Amended Complaint alleges a sufficiently serious deprivation to satisfy the objective prong of the Eighth Amendment inquiry. *See Parker v. Maryland*, 413 F. App'x 634, 638 (4th Cir. 2011) ("Since Parker was murdered while in custody, the first part of the test is clearly satisfied."). The question facing the Court is therefore whether Plaintiff has plausibly alleged facts showing either direct or supervisory deliberate indifference on Graham's part. To make this determination, the Court analyzes Graham's role in two separate decisions: (1) the decision to refuse Largent's request to be moved into protective custody; and (2) the decision to assign Frye as Largent's cellmate.

Starting with the first decision, much of the Amended Complaint focuses on WCI officials' decisions to deny Largent placement in protective custody after Largent reported that a group of prisoners in the general population had threatened him because Largent's alleged victim was their "homeboy's sister." (Am. Compl. ¶ 30.) Plaintiff alleges that Graham was twice apprised of this situation between August and November 2017 and failed to intervene by placing Largent in protective custody.

The Court cannot find a constitutional violation in relation to Graham's failure to intervene for two independent reasons. First, there is the fact that even though he was not moved to protective custody, Largent spent his entire term at WCI in administrative or disciplinary segregation and was never moved back to the general population. As Plaintiff acknowledges, this status actually limited Largent's interactions with other prisoners substantially more than

9

movement to protective custody would have. (Am. Compl. ¶ 40.) Particularly because Largent was unable to identify the inmates who allegedly threatened him—making it impossible to rule out that some of their associates may have been among the inmates in protective custody—keeping Largent in segregation thus protected Largent from those individuals more effectively than placement in protective custody could have. Though the decision to make Frye Largent's cellmate rendered this protection moot, the Court cannot find that the decision to keep him in segregation, rather than protective custody, represented a failure to protect Largent from the identified threat.

Second, even if Largent had been returned to the general population, Largent's allegations still would not establish deliberate indifference on Graham's part in relation to this decision, given Graham's limited supervisory role. The Amended Complaint alleges that each time Graham was informed of Largent's concerns, Graham appropriately instructed his subordinates to investigate the situation and determine whether Largent qualified for protective custody. This is precisely how the Warden of a facility designed to house over 1,700 inmates should react to the sort of allegations Plaintiff presented. *See Maryland Manual Online: Department of Public Safety and Correctional Services*, Maryland State Archives, http://msa.maryland.gov/msa/mdmanual/22dpscs/html/22agen.html#western (last visited Dec. 16, 2020) (noting WCI "is designed to house 1,793 inmates"). A Warden cannot reasonably be tasked with micromanaging his facility's response to every inmate request and must necessarily entrust investigations to subordinates. *See Johnson v. Johnson*, 385 F.3d 503, 526 (5th Cir. 2004) (noting that a Warden "cannot be expected to intervene personally in response to every inmate letter they receive" and that referring a matter for further investigation is generally "a reasonable discharge of their duty to protect the inmates in their care"). Though Plaintiff may have an argument that Graham's subordinates made an improper determination, the Amended Complaint includes no

allegations of widespread abuses by WCI staff that could make Graham liable for an erroneous decision based solely on his status as supervisor in charge. *See Walker v. Bishop*, Civ. No. MJG-16-3136, 2018 WL 1920585, at *8–9 (D. Md. Apr. 24, 2018) (dismissing similar claims against former WCI Warden).

Much more problematic than the decision to deny Largent's request to be moved into protective custody was the assignment of Frye as his cellmate. Plaintiff alleges facts showing that Frye was a physically overpowering man with a history of attacking his cellmates and others. Based on these alleged facts, the Court finds it plausible that by housing such a dangerous individual with a much smaller sixty-nine-year-old, certain WCI officials overlooked a clear risk that Frye would severely harm Largent. Where, even with the benefit of hindsight, it is unclear whether the decision to deny Largent's request for protective custody was made in error, there can be no doubt, accepting the accuracy of Plaintiff's allegations at this stage (as the Court must), that assigning Frye as Largent's cellmate was a serious mistake.

However, Plaintiff's § 1983 claim against Graham will nevertheless be dismissed because Plaintiff has not plausibly alleged facts showing deliberate indifference. To establish direct deliberate indifference under the standard discussed above, Plaintiff would need to plausibly allege that: (1) Graham knew Frye was very likely to attack a cellmate; (2) Graham knew Largent was particularly vulnerable to attack; (3) Graham knew Largent and Frye were assigned as cellmates; and critically, (4) Graham drew the inference that by placing Frye with Largent, his subordinates were subjecting Largent to an unreasonable risk of harm. Plaintiff does not allege facts supporting the conclusion that Graham knew all these details and drew the necessary inference.

Though the Amended Complaint repeats a conclusory assertion that, as the Warden of WCI, Graham "knew or reasonably should have known" the danger Largent faced from Frye, it

does not include factual allegations that could plausibly support a finding of actual knowledge. (Am. Compl. ¶¶ 43, 54, 79.) As noted, Graham held overall responsibility for an institution with the capacity to hold over 1,700 inmates. Accordingly, rather than requiring the Warden to manage hundreds of cell assignments, WCI policy delegated responsibility for individual cell assignments to lower-level subordinates. *See* WCI Directive No. 230.0004.1.05(A) (delegating authority for initial housing assignments to "Housing Unit OIC's and Transfer Coordinator in the Traffic Office" and cell assignments for current inmates to "the Housing Unit Manager or OIC"). WCI policy did require the Warden to review referrals for single cell housing. However, contrary to Plaintiff's arguments in her briefing, the facts pled in the Amended Complaint do not provide any basis on which to surmise that Graham ever reviewed such a referral for either Frye or Largent. Indeed, the Amended Complaint specifically alleges that WCI personnel "fail[ed] to consider either Decedent Largent or Frye for available single-cell accommodations." (Am. Compl. ¶ 65.) The Amended Complaint also lacks any plausible allegation that Graham's attention was ever specifically drawn to Frye's cell assignment outside of the regular course. Largent's only complaints to Graham predated Frye's transfer to WCI and therefore cannot have drawn Graham's attention to that cellmate assignment. Further, though Plaintiff alleges Frye complained about Largent to prison officials, Plaintiff does not allege either inmate ever made a formal report that could have made its way to Graham. In sum, though Plaintiff asserts Graham "reasonably should have known" of the danger Frye posed and had "constructive" notice of the same (*id.* ¶¶ 43, 54, 79), Plaintiff has not alleged facts allowing the plausible conclusion that Graham actually drew the inference that Largent was in serious danger. *See Walker*, 2018 WL 1920585, at *8–9 (dismissing similar claims against WCI Warden); *Wilkins*, 639 F. App'x at 945–46 (granting

qualified immunity to Warden whose officer sexually abused prisoner, based on Warden's lack of knowledge); *Doe v. Whidden*, 557 F. App'x 71, 72–73 (2d Cir. 2014).

Likewise, Plaintiff has not alleged facts supporting a finding of supervisory deliberate indifference on Graham's part. Though the Amended Complaint includes a conclusory assertion that "Defendant Graham acquiesced in, tolerated and permitted a pattern and practice of unlawful, improper and unconstitutional behavior at the WCI," this accusation is not supported by any concrete factual allegations. (Am. Compl. ¶ 82.) Without such allegations, the Amended Complaint provides no basis upon which to find that Graham "had actual or constructive knowledge that his subordinate[s were] engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury." *Wilkins*, 639 F. App'x at 944 (internal quotation marks omitted); *see also Walker*, 2018 WL 1920585, at *8–9 (dismissing supervisory liability claim because the "facts alleged [did] not plausibly suggest a history of widespread abuse"). Thus, because the Amended Complaint fails to provide factual allegations supporting a finding of deliberate indifference, the § 1983 claim will be dismissed.[5]

Having dismissed Plaintiff's sole federal claim prior to discovery, the Court will decline to exercise supplemental jurisdiction over Plaintiff's state law claims and will remand the dispute to the Circuit Court for Allegany County, Maryland. 28 U.S.C. § 1367(c)(3) establishes a district court's discretion to decline to exercise supplemental jurisdiction when "the district court has dismissed all claims over which it has original jurisdiction." *See Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995) ("[T]rial courts enjoy wide latitude in determining whether or not to retain jurisdiction over state claims when all federal claims have been extinguished."). Here, the Court

---

[5] Because the Court dismisses Plaintiff's § 1983 claim on the ground that Graham did not commit a constitutional violation, the Court need not consider the second step of the qualified immunity inquiry. *See Pearson v. Callahan*, 555 U.S. 223 (2009).

has dismissed Plaintiff's lone federal claim prior to discovery. The remaining claims present questions of state law that largely turn on issues separate from the "deliberate indifference" inquiry discussed above. Accordingly, the Court finds that remanding to the Circuit Court for Allegany County, Maryland for further proceedings is the appropriate course. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) ("[A] district court has discretion to remand to state court a removed case involving pendent claims[.]").

### IV. Conclusion

For the foregoing reasons, an order shall enter: (1) granting Defendants' Second Motion to Dismiss as to Plaintiff's 42 U.S.C. § 1983 claim (ECF No. 29); (2) denying as moot Defendants' First Motion to Dismiss (ECF No. 11); and (3) remanding the matter to the Circuit Court for Allegany County, Maryland.

DATED this 18th day of December, 2020.

BY THE COURT:

_____
James K. Bredar
Chief Judge